# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 94-CA-00583-SCT

*UNITED SERVICES AUTOMOBILE ASSOCIATION*

*v.*

*PATRICIA SHELL, a/k/a PATSY LOU SHELL, AS ADMINISTRATRIX OF THE ESTATE OF AARON SHELL, JR., DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/25/94 |
| TRIAL JUDGE: | HON. R. B. REEVES, JR. |
| COURT FROM WHICH APPEALED: | FRANKLIN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM M. DALEHITE, JR. |
| ATTORNEYS FOR APPELLEE: | W.H. MCGEHEE |
| | H.B. MAYES MCGEHEE |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | REVERSED AND RENDERED - 8/14/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/5/97 |

**BEFORE DAN LEE, C.J., PITTMAN AND MILLS, JJ.**

**PITTMAN, JUSTICE, FOR THE COURT:**

¶1. Aaron Shell, Jr., was murdered by a hitchhiker he picked up on July 8, 1991. The Franklin County Chancery Court found that his estate was entitled to benefits from an Uninsured Motorist (UM) policy issued by United Services Automobile Association. We find, however, that Shell's assailant was not the "owner or operator" of an uninsured motor vehicle as contemplated by the USAA policy or Miss. Code Ann. § 83-11-101 (1991). Accordingly, the judgment of the chancery court is reversed and rendered.

## I.

¶2. Aaron Shell, Jr., was killed when Murray "Bobo" Crawford fired three gun shots from a .38 caliber Smith and Wesson revolver into his head. Apparently, Shell had driven to Fayette, Mississippi, and was returning home for his thirtieth anniversary celebration when he picked up Crawford, who was walking along Highway 84. According to his confession, Crawford held Shell at gunpoint, forced him out of the truck and into the woods near Hamburg, Mississippi, some distance off Mississippi Highway 33. He took Shell's wallet and found it empty. Crawford stated that he had to shoot Shell to

keep him from remembering his face. Although Crawford drove the truck to Slidell, Louisiana, and abandoned it there after killing Shell, the parties do not dispute that Crawford did not operate the truck prior to the murder. Furthermore, there is no evidence that Crawford murdered Shell in order to gain use of the vehicle.

¶3. Shell's 1989 Dodge pick-up truck was insured by United States Automobile Association ("USAA").

¶4. Patricia Shell, as administratrix of the estate of Aaron Shell, Jr., deceased, filed suit in the Chancery Court of Franklin County on November 6, 1992, seeking a declaratory judgment and damages for wrongful death pursuant to Miss. Code Ann. § 11-7-13 after USAA advised her that her husband's death was not covered under the terms of his UM policy. She asserted that Shell's heirs were entitled to UM benefits in the amount of $400,000 under his USAA policy. After significant discovery had taken place, USAA first sought a transfer to circuit court for a jury trial and then filed a motion for summary judgment. Ultimately, the parties agreed that in lieu of a jury trial, briefs would be submitted to the chancellor and oral arguments presented.

¶5. Oral arguments were heard on September 30, 1993. Prior to that time, the parties stipulated that the only factual materials to be considered by the court were the affidavit of Highway Patrolman Jeff Roberts, who was involved in the homicide investigation, and the videotaped confession of Murray Crawford. The only issue presented to the court at that time was whether the plaintiff was entitled to UM coverage. On November 9, 1993, the court filed a letter opinion finding that Shell's estate was entitled to recover UM benefits from USAA. Following a separate hearing on the issue of damages, the chancellor further found that Shell's heirs and wrongful death beneficiaries were entitled to damages of $250,000.

¶6. On May 31, 1994, a final decree and judgment was entered. USAA appealed, asserting that, under the facts of this case, the chancellor erred as a matter of law in holding that Shell's estate was entitled to UM benefits.

## II.

¶7. The estate's claim for uninsured motorist benefits is based upon the murder of Aaron Shell, Jr., by a hitchhiker. At the time of his death, Shell had in effect a policy of motor vehicle insurance with USAA which provided him with uninsured motorist benefits in certain situations. Our initial inquiry, therefore, must begin with the insurance policy itself, the contract between the parties. *Cauthen v. National Bankers Life Ins. Co.*, 88 So. 2d 103 (Miss. 1956). The applicable USAA policy language provides:

UNINSURED MOTORISTS COVERAGE

We will pay compensatory damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of:

1. [Bodily Injury] sustained by a covered person and caused by an accident; and

2. [Property Damage] caused by an accident if the Declarations indicates that both [bodily injury] and [property damage uninsured motorist] Coverage applies.

*The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the uninsured motor vehicle.* We will pay under this coverage only after the limits of liability under any applicable liability bonds or policies, or deposits of cash or securities have been exhausted by payment of judgments of settlements.

Any judgment for damages arising out of a suit brought without our written consent is not binding on us.

(Emphasis added.) Under the terms of the policy, therefore, Shell's estate must prove (1) that Murray Crawford was the "owner or operator" of an uninsured vehicle at the time of Shell's injuries; (2) that the death of Aaron Shell, Jr. was "caused by an accident;" and (3) that the liability for the damages arising out of Shell's death arose "out of the ownership, maintenance or use of the uninsured motorist vehicle."

¶8. Correspondingly, Mississippi statutory law requires an insured to prove three elements in order to prevail on an uninsured motorist claim. Miss. Code Ann. § 83-11-101 (1991), in pertinent part, provides as follows:

No automobile liability insurance policy or contract shall be issued or delivered after January 1, 1967, unless it contains an endorsement or provisions undertaking to pay the insured all sums which he shall be legally entitled to recover as damages for bodily injury or death *from the owner or operator of an uninsured motor vehicle . . . .*

Miss. Code Ann. § 83-11-101(1991) (emphasis added). Under the statute, an injured insured must prove that (1) the insured must be legally entitled to recover damages for bodily injury or death; (2) from the owner or operator; (3) of an uninsured motor vehicle. The policy includes all that the statute does and more. Therefore, if Shell's estate can prove the three elements required by the policy, then the requirements of the statute are also met.

### III.

¶9. It is necessary for our decision that we focus our inquiry only on whether Crawford was the "owner or operator" of an uninsured motor vehicle. Both parties agree that in order for Shell's estate to recover any UM benefits, it must be proven that Crawford, indeed, was the owner or operator of an uninsured vehicle. The burden of proof falls on the estate.

¶10. Shell's estate asserts that Crawford's statement/confession was evidence that he operated the uninsured vehicle. Furthermore, the estate contends that from the moment that Crawford pulled his gun on Shell, Crawford assumed control and became the "operator" of the truck. The estate points to the fact that Crawford actually drove the truck after he shot Shell to support its contention that Crawford was the "operator" of the vehicle as contemplated by the uninsured motorist statute. Moreover, Shell relies upon the chancellor's finding that "Mr. Crawford had taken over use and control of the vehicle of Mr. Shell . . . [and] [t]he death of Mr. Shell was caused by the acts of Mr. Crawford while he had the use and control of the truck which was an uninsured vehicle as to Mr. Shell." We are not, however, bound by a chancellor's finding of fact. Rather, it is our job to determine if the chancellor erred in making his findings.

¶11. The estate further bases its "proof" that Crawford operated the car on its assertion that USAA "stipulated" to the fact "that Murray Crawford took over control before Mr. Shell was shot and drove the truck after he shot Mr. Shell." This is not a correct statement of the stipulation made by the parties. With regard to the factual matters to be considered by the court, the stipulation provided only that:

> The parties in the above styled cause hereby stipulate that the only factual materials to be considered by the Court in ruling on this matter are the Affidavit of Jeff Roberts attached to the Defendant's Motion for Summary Judgment and the videotaped confession of Murray Crawford. Although the defendant consents to the Court reviewing this videotape, the defendant does not concede that its entire contents are relevant or admissible.

In Crawford's unsworn confession, he stated that he pulled a gun on Aaron Shell, Jr., and told him where to drive. It is this statement upon which the estate mainly relies to support its assertion that Crawford operated the vehicle.

¶12. To bolster Crawford's testimony, the estate further asserts:

> There is no dispute that Murray Crawford took over effective control and operation of the truck when he pulled his pistol and told Aaron Shell, Jr., where to go, when to stop, get out, etc. More importantly, to be an "operator" does not even require that you actually put the car in motion or drive the car. A stopped car is considered to be "used," "driven" or "operated" since stops are necessary and incidental to the "operation" of a car. 7A Am. Jur. 2d. § 191.

¶13. The estate mistakenly relies on the definition of "operator" provided in the treatise's discussion of "Automobiles and Highway Traffic," rather than that found under the more relevant topic of "Automobile Insurance." There we note that: "There is considerable authority to the effect that the word 'operate,' as used in the coverage or exception provisions of automobile policies, means to regulate and control the actual operation of the car, that is, to have charge of it as the driver." 7 Am. Jur. 2d *Automobile Insurance* § 127. The definition further notes that "there is also authority to the effect that the terms are not limited to such direct physical control of the vehicles," such that one has been found to be an operator when exercising some control over a vehicle though not sitting in the driver's seat. ***See, e.g.Lumbermen's Mut. Cas. Co. v. McIver,*** 110 F.2d 323 (9th Cir. 1940), *cert. denied,* 311 U.S. 655, 61 S.Ct. 8, 85 L.Ed. 419 (1940) (teacher who grabbed steering wheel from student driver and hit the emergency brake prior to accident held to be "operator" of motor vehicle). The few cases defining "operator" are highly fact-specific and focus on the degree of control exerted by the one alleged to be the operator and the vehicle, not as the estate would try to persuade us, by the control exerted over the driver of the vehicle. At least one court, therefore, has defined "operator" as synonymous with "driver." ***Orth v. Universal Underwriters Ins. Co.,*** 284 F.2d 857 (8th Cir. 1960). Only where a gun was fired by the driver of an uninsured motor vehicle at an insured while both were driving along a highway has it been found that injuries from an intentional gunshot were caused by the "owner or operator of an uninsured motor vehicle." ***Continental Western Ins. Co. v. Klug***, 415 N.W. 2d 876 (Minn. 1987).

¶14. The estate, however, directs our attention to ***Alabama Farm Bureau Mut. Cas. Ins. Co. v. Mitchell***, 373 So. 2d 1129 (Ala. 1979), for the proposition that an assailant who seizes possession of the victim's vehicle before inflicting a fatal injury to the victim is deemed to "operate" the vehicle

under an automobile policy. *Mitchell* is distinguishable in many ways from the case *sub judice*. Based on the admissions of Mrs. Mitchell's confessed killer,

> Brown was employed by Mrs. Mitchell to cut her lawn, trim hedges, and do other odd jobs. He lived near her residence with his parents and had known Mrs. Mitchell about a year. On the day of the murder, Brown went to see Mrs. Mitchell. He and Mrs. Mitchell began to "tussle." Brown threw Mrs. Mitchell on the floor, straddled her, and hit her with his fists. He bumped her head on the floor a number of times and took a towel and tried to choke her with it. Mrs. Mitchell became unconscious or semi-conscious, at which time Brown took Mrs. Mitchell's car keys out of her purse, drove her car around to the back door, took a blanket and wrapped it around her, and placed Mrs. Mitchell in the trunk of her car. Brown said it seemed Mrs. Mitchell was making faint groaning noises when he put her in the trunk. He thought she was dying. Brown drove the car all day; he then parked the car behind an old abandoned house and walked home. The car remained there all night with Mrs. Mitchell in the trunk. Brown testified he looked in the trunk on one occasion after he thought he heard bumping noises while he was driving around. He said Mrs. Mitchell did not move and he assumed she was dead. Brown touched her and said she felt damp cold. In Brown's best judgment, two hours had elapsed between the time he put Mrs. Mitchell in the trunk and the time he looked in on her. Brown drove the car through rural areas of the county the next day and left the car in a field. He looked in on Mrs. Mitchell again and said he was sure she was dead. He closed the trunk and left.

*Id.* At all times, Brown had total control over Mrs. Mitchell's vehicle. He drove the car around with its semi-conscious owner in the trunk. She died in the trunk of her car from lack of food, water and oxygen. In contrast, in the case *sub judice,* Shell was driving his own car. While Crawford may have exerted control over Shell in forcing him to drive from the roadway to a more secluded wooded area, Crawford had no control over the vehicle itself. Moreover, while Mrs. Mitchell died in her vehicle; the record indicates that Shell was forced out of his pick-up truck before Crawford shot him.

¶15. Even more to the point, the issue in *Mitchell* was not whether Mrs. Mitchell's killer was the operator of an uninsured motor vehicle, but whether her death arose out of the use of the car and whether benefits were payable under the UM policy where the death of the insured results from an intentional act. The Alabama Court found that Mrs. Mitchell's death was the result of an accident within the meaning of the policy and thus, recovery was granted. *Id.* at 1136.

**IV.**

¶16. Because neither the law nor the evidence supports the estate's claim that Crawford was the "operator" of Shell's vehicle as contemplated by the USAA policy or our UM statute, we need not reach the issues of whether Shell's death was an accident or whether it arose out of the ownership, operation or use of an uninsured motor vehicle. We therefore reverse and render the decision of the chancery court.

¶17. It is not necessary that we follow other discussions. However, we should cite Mississippi cases seemingly on point dealing with liability for damages arising out of Shell's death as "ownership, maintenance or use of the uninsured motorist vehicle."

¶18. This question of law is well settled in Mississippi. We have clearly determined that "a shooting of an insured driver by an uninsured motorist did not arise out of the ownership, maintenance or use of that vehicle and therefore [does] not fall under the [uninsured motorist] coverage of the insurance polic[y]." *Spradlin v. State Farm Mut. Auto. Ins. Co.*, 650 So. 2d 1383, 1386 (Miss. 1995) (citing *Coleman v. Sanford*, 521 So. 2d 876 (Miss. 1988); and *Roberts v. Grisham*, 487 So. 2d 836 (Miss. 1986)).

¶19. In *Roberts*, Roberts and Grisham began the incident in separate cars. Grisham followed Roberts until he stopped his car. At this time Grisham left his car and went to Roberts' car. Grisham walked over to the driver's side and shot Roberts in the head inflicting a fatal wound. *Roberts*, 487 So. 2d at 837. In denying coverage under an uninsured motorist policy, this Court stated that:

> [i]n order for liability to attach under the coverage provision in the case sub judice, the act or acts committed at the time the wrongful cause was set in motion must have arisen out of either the maintenance, operation, or use of the vehicle; that they must have continued in unbroken sequence to cause the plaintiff's injury; and any intervening cause that interrupted or broke that sequence removed any developing liability. We are of the opinion that the shooting of Roberts by Grisham was an intervening cause, which broke the use sequence of the automobile and death of Roberts.

*Id.* at 839.

¶20. Two years later the Court was again faced with a similar situation. In *Coleman*, the facts were undisputed that Coleman and Sanford were driving opposite directions on the highway when Sanford crossed over the center line and struck Coleman's vehicle. Coleman was allowed to leave, but Sanford was asked to pull his vehicle to the side of the road so that the police officers present at the wreck might administer a test to determine if Sanford was intoxicated. *Coleman*, 521 So. 2d at 876. However, instead of pulling his vehicle to the side of the road, Sanford got into his vehicle and began following Coleman. Subsequently, Sanford caught up with Coleman and proceeded to shoot into Coleman's car while both cars were moving. Coleman was injured severely by the incident. *Id.* at 876-77. Again, this Court denied coverage to the injured party under an uninsured motorist policy. Relying upon *Roberts*, this Court held that "[a]lthough Sanford cites cases from other jurisdictions to the contrary . . . in Mississippi *Roberts* controls." *Id.* at 877 (citations omitted).

¶21. Finally, just last year this Court again faced the same case. In *Spradlin*, this Court again denied coverage to an injured person who was shot at by another. *Spradlin*, 650 So. 2d at 1388. As this Court stated last year, "this Court has already deliberated both sides of this issue and made an informed decision that the shootings in those cases did not arise out of the ownership, operation or use of the uninsured motor vehicle." *Id.* It is well settled law in Mississippi that a shooting of a victim while in a car by someone who is in an uninsured motor vehicle is not arising out of the ownership, maintenance or use of the uninsured motorist vehicle. Thus, the lower court erred in finding to the contrary.

¶22. The lower court erred in finding that uninsured motorist benefits should have been awarded to Aaron Shell, Jr.'s, estate. We have reviewed this question before and clearly held to the contrary. To allow such a recovery is against the principle and policy behind uninsured motorist coverage. Thus, the case is reversed and rendered holding that Aaron Shell, Jr.'s, estate is not entitled to uninsured

motorist benefits.

¶23. **REVERSED AND RENDERED.**

**PRATHER AND SULLIVAN, P.JJ., BANKS, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY.**